# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lisa George,                                    :
                          Petitioner             :
                                                 :
              v.                                 :   No. 1247 C.D. 2016
                                                 :   Submitted: December 9, 2016
Unemployment Compensation Board                  :
of Review,                                       :
                          Respondent             :


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE JAMES GARDNER COLINS, Senior Judge


**OPINION NOT REPORTED**


**MEMORANDUM OPINION**
**BY JUDGE COHN JUBELIRER**                    **FILED: April 19, 2017**


Lisa George (Claimant) petitions for review of an Order of the Unemployment Compensation (UC) Board of Review (Board) affirming a UC Referee's (Referee) Decision finding Claimant ineligible for UC benefits pursuant to Section 402(e) of the UC Law (Law).[1]  On appeal,[2] Claimant argues that the

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, as amended, 43 P.S. § 802(e).  Section 402(e) provides that an employee is ineligible for UC benefits if "h[er] unemployment is due to h[er] discharge or temporary suspension from work for willful misconduct connected with h[er] work." Id.

[2] Claimant's brief is somewhat difficult to follow.  While she uses headings within her Argument section that correspond to her Statement of Questions Involved, she makes a number of different arguments under each heading that do not, necessarily, correspond to each heading.

*(Continued…)*

Board erred in finding her ineligible because: (1) the Mercer County District Attorney's Office (Employer)[3] did not satisfy its burden of proving willful misconduct because her actions did not amount to insubordination, or willful misconduct; (2) even if Claimant did violate Employer's policy or rule, she had good cause for doing so; and (3) the Board erred in finding Claimant ineligible for benefits. Because we conclude that Claimant has not established good cause for her actions, we affirm.

Claimant was employed by Employer from January 1987 until March 1, 2016, however, her last day of work before she was placed on paid administrative leave was January 29, 2016. (R.R. at 8a.) At the time of her discharge, Claimant was a diversionary trial case manager. (Id.) Claimant filed an application for UC benefits on March 6, 2016. (Claim Record, R. Item 1.) Claimant stated that she was discharged for accidentally saying "the F word" to a victim on the phone, and further, "for seve[ra]l things but I guess it was the misrepresenting the office while I was suspended" and for "call[ing] the police department in defense of my reputation." (Claimant Questionnaire, R. Item 3.)

On the request for separation and wage information, Employer stated that Claimant was discharged for "[r]ule [v]iolations, [u]nsatisfactory [w]ork [p]erformance and [for being] a disruptive influence with conduct that was adverse to the District At[torney's] Office." (Employer's Notice of Application, R. Item 2.) Employer attached a letter of termination dated March 1, 2016, from the

<hr>

Nevertheless, we have read through Claimant's brief and have tried to address the arguments that Claimant raises.

[3] Employer has intervened in this matter, and the Board has not filed a brief because it "believes that the Intervenor's brief adequately covers the issues that the Board would have briefed." (Board Letter, filed Nov. 17, 2016.)

2

Mercer County District Attorney advising Claimant that she was being terminated, and another letter dated February 25, 2016, from the Greenville-West Salem Police Department, notifying Employer that Claimant had called various police departments on behalf of Employer to conduct a survey about her job performance. (Id.; R.R. at 92a, 95a.)  Employer also attached various documents to its Employer Questionnaire, including a copy of meeting notes dated January 29, 2016, a suspension letter dated February 1, 2016, a letter notifying Claimant of a follow-up meeting dated February 3, 2016, another letter dated February 18, 2016, from Human Resources that provided Claimant with the opportunity to respond, and Claimant's response dated February 26, 2016.  (Employer Questionnaire and Follow-up Letter, R. Item 2; R.R. at 82a-87a.)  In response to the UC Service Center's oral interview question asking Claimant if she had been warned in the past about her attitude and being a disruptive influence, Claimant responded that she had previously been warned in writing, but that she could not remember the date of the warning.  (Record of Oral Interview, R. Item 4.)

The UC Service Center issued a Notice of Determination on March 29, 2016, finding Claimant ineligible for benefits pursuant to Section 402(e) of the Law.  (R.R. at 1a.)  The UC Service Center determined that "Claimant was discharged for misrepresentation of the District Attorney[']s Office while under suspension" and for "[c]ontacting police departments and other staff while on probation."  (Id.)  Thus, Claimant's actions constituted willful misconduct, and "Claimant [did] not show[] good cause for her actions."  (Id.)  Accordingly, the UC Service Center concluded that Claimant was ineligible for benefits beginning with the waiting week ending March 12, 2016.  (Id.)

3

Claimant appealed to the Referee asserting that she "disagree[d] with the findings of fact concerning the misrepresentation of the DA's office." (Petition for Appeal, R. Item 6.) A hearing on Claimant's appeal was held before the Referee on April 25, 2016. (Notice of Hearing, R. Item 8.) Employer appeared with counsel and four witnesses: Human Resources Director; Assistant District Attorney; District Attorney; and Director of the Office of Victim Services. Claimant appeared with counsel and one witness, her husband, who did not testify.

Claimant testified[4] that she was not given specific instructions as to what she could and could not do during her administrative leave. Claimant did not think Human Resources Director would accept a written response from her in response to the February 18, 2016 letter, so Claimant decided to call various police departments and crime victims because they knew her best. Claimant admitted to making the calls while she was on administrative leave, but she denied indicating to those individuals that she was calling on behalf of the District Attorney. Further, she did not tell the individuals that she was on paid administrative leave when she called. Claimant also admitted to using profanity on the phone with a crime victim, though she thought he had hung up, and to her co-workers; keeping a diary on her work computer, which included comments about her co-workers; and creating a file folder about Director of the Office of Victim Services, referred to as "Attack on J[ . . . ],"[5] in which Claimant kept close tabs on Director of the Office of Victim Services' whereabouts during the workday.

---

[4] Claimant's testimony appears on pages 60a-78a of the Reproduced Record.
[5] Pages from the "Attack on J[ . . . ]" file appear on pages 98a-111a of the Reproduced Record.

4

Human Resources Director testified[6] about the January 29, 2016 meeting with Claimant and District Attorney, at which Claimant admitted to saying "f*** you" to a crime victim on the phone. (R.R. at 11a.) Further, in the meeting, Claimant tried to defend herself and also used the term to describe such victims as "dregs of society." (Id.) Human Resources Director stated that Claimant was very angry, raised her voice, yelled at District Attorney, and insulted Human Resources Director during the meeting. Human Resources Director recalled that she and District Attorney had found out about several other incidents involving Claimant, which resulted in them extending Claimant's suspension. At the February 5, 2016 meeting, Human Resources Director testified that Claimant denied the comment she had made in the January 29, 2016 meeting. Human Resources Director noted that at that meeting, she and District Attorney addressed Claimant's general interactions with her co-workers. Human Resources Director also recalled numerous complaints filed by other employees in the office and a file that was found on Claimant's desk titled "Attack on [J . . . ]." (Id. at 17a.) Human Resources Director also explained that the office had to be restructured so Claimant did not have much interaction with staff and that Claimant continued to act in an unprofessional manner to her fellow employees. Human Resources Director also testified regarding Employer's Employee Conduct and Discipline Policy, which lists certain unacceptable behavior including "[f]ailure to follow a supervisor's specific instructions or to perform assigned official duties" and "[o]bscene or abusive language." (Id. at 21a-22a; Employee Conduct and Discipline Policy, R.R. at 123a.) In addition, the policy prohibits insubordination,

---

[6] Human Resource Director's testimony appears on pages 8a-32a of the Reproduced Record.

5

"[i]mmoral, indecent, abusive or menacing conduct," and "[j]ob incompetence, including non-adherence to established policies and procedures[.]" (Id. at 123a-24a.)

Assistant District Attorney testified[7] about his awareness of the file Claimant kept on Director of the Office of Victim Services and the changes made in the office due to Claimant's behavior and Claimant's use of profanity. He recalled incidents that occurred between Claimant and Director of the Office of Victim Services, including one after which Claimant was ordered by the previous District Attorney to cease having any verbal interaction with Director of the Office of Victim Services, though she spoke to Director of the Office of Victim Services despite being ordered not to. Assistant District Attorney also explained an incident that occurred between himself and Claimant, in which Claimant made insulting comments to Assistant District Attorney. Assistant District Attorney testified that the atmosphere in the office changed when Claimant was there and that other employees were afraid to get on her bad side. Assistant District Attorney also recalled Claimant's inappropriate actions regarding a criminal case involving her nephew, including an entry she made in her diary on her work computer that she had searched her co-workers' desks in an attempt to locate her nephew's case file.

District Attorney testified[8] that he spoke to Claimant and all employees of the office shortly after taking office and informed them that they would act professionally at all times. District Attorney recalled signing Claimant's termination letter, which resulted from Claimant's actions in calling different

---

[7] Assistant District Attorney's testimony appears on pages 32a-40a of the Reproduced Record.

[8] District Attorney's testimony appears on pages 40a-54a of the Reproduced Record.

6

police departments and victims about her work performance. District Attorney stated that Claimant "had no authority to be calling anyone on [his] behalf and representing that she was, in fact, representing the office . . . ." (R.R. at 45a.) He also testified to being present when Claimant made the "dregs of society" comment at the January 29, 2016 meeting, and that Claimant thereafter denied ever making that comment. District Attorney indicated that it was a difficult decision to fire Claimant, and that her termination was warranted based upon the misrepresentations she made to other police departments and victims that she was acting on his behalf without his permission.

Director of the Office of Victim Services testified[9] briefly that she made multiple complaints regarding Claimant's conduct. In particular, Director of the Office of Victim Services explained her reaction to finding a folder in the office titled "Attack on J[ . . . ]" and that she did not know what to do. (R.R. at 55a.) Director of the Office of Victim Services recalled that Claimant had used profanity towards her, glared at her, slammed doors, made insulting comments to her, and spoke to her when Claimant was ordered not to.

Based on the evidence presented, the Referee made the following findings of fact:

1. The [C]laimant was employed by the Mercer County District Attorney's Office as a trial case manager earning $55,000 per year from January 1987 through January 29, 2016, her last day of work.

2. The [C]laimant was issued verbal reprimands regarding her unprofessional interactions with staff in 2012 and 2014.

---

[9] Director of the Office of Victim Services' testimony appears on pages 54a-59a of the Reproduced Record.

7

3.  The [C]laimant received a formal written reprimand on July 21, 2014, for continued confrontational and unprofessional insubordinate actions.

4.  On January 29, 2016, the [E]mployer met with the [C]laimant to discuss a complaint they [sic] received from a victim who indicated the [C]laimant had said "F*[**] you" to the victim while he was on the telephone with her.

5.  During the January 29, 2016 meeting, the [C]laimant admitted to saying "F*[**] you" but indicated she believed the caller had already hung up before she made the statement out of frustration.

6.  During the January 29, 2016 [meeting], the [C]laimant expressed her frustrations of working with the "dregs of the society[.]"

7.  The [C]laimant was placed on a one-week suspension effective January 29, 2016.

8.  While the [C]laimant was on suspension, the Human Resource department reviewed the [C]laimant's past disciplinary action with the current District Attorney.

9.  District Attorney . . . had just taken over the position of District Attorney effective January 4, 2016.

10. On District Attorney['s] . . . second day on the job, he met with the [C]laimant to discuss his requirement[s] that the [C]laimant act in a professional manner and communicate professionally with her coworkers.

11. District Attorney . . . also met with the entire staff of his office advising all staff that he expected the office to interact with the constituents in a professional and customer[-]friendly manner.

12. As a result of the review of the [C]laimant's previous disciplinary action, as well as the statement she made during the January 29, 2016[] disciplinary meeting, the District Attorney decided to extend the [C]laimant's suspension while he could further investigate the appropriate disciplinary action.

13. On February 5, 2016, the [E]mployer met with the [C]laimant and spoke to her about her additional comments of referring to the members of the community as the "dregs of society[.]"

14. During the February 5, 2016 meeting, the [C]laimant denied making the comment referring to anyone as "dregs of society[.]"

15. While the [C]laimant was on suspension, the [E]mployer became aware of an incident where the [C]laimant had taken steps to look in other employee's [sic] desks to find a file of her nephew which was being handled by the District Attorney's office.

16. On February 18, 2016, the [E]mployer sent a letter to the [C]laimant advising her of the issues they [sic] were reviewing in determining what actions would be taken regarding her employment.

17. The February 18, 2016[] letter listed the issues of the [C]laimant's telephone call with a victim, her statements made during the January 29, 2016[] suspension meeting, her history of unprofessional conduct with the [A]ssistant District Attorney and office manager, as well as an issue of her handling her nephew[']s case which had been assigned to the District Attorney's office.

18. The letter advised the [C]laimant that "Because we did not know the facts of this last matter about your nephew's case before we met with you, we did not discuss it with you. For that reason, you are being given an opportunity to respond to the information above. . ."

19. Upon the [C]laimant's receipt of the February [1]8, 2016[] letter, she decided to contact police departments and victims she had worked with in the past to take a survey regarding her work performance.

20. When the [C]laimant contacted the police departments, she did not advise them that she was on suspension and asked if they would be willing to answer a survey question indicating that the survey responses would be given to the District Attorney.

21. The [C]laimant asked the police officers, "In your opinion and based on your experiences, is Lisa George professional,

9

responsible, respectful and knowledgeable of the criminal justice system and criminal cases, and a good ambassador for the DA's office?"

22. The [C]laimant wrote a response letter dated February 26, 201[6], to the [E]mployer advising the [E]mployer that she had contacted various police departments and victims and they affirmed she was a good ambassador for the DA's office.

23. On February 25, 2016, the District Attorney received a telephone call from the Greenville Police Department reporting that the [C]laimant had called conducting a survey.

24. The [C]laimant was terminated from her position, via letter dated March 1, 2016, for several incidents of misconduct, unprofessionalism and behaving in an inappropriately confrontational manner with coworkers and others.

(Referee Decision, Findings of Fact (FOF) ¶¶ 1-24.) The Referee determined that "[C]laimant was terminated for multiple offenses of unprofessionalism and inappropriate behavior . . . [and] that . . . [C]laimant had received warnings over the years advising her that she needed to act in a professional manner." (Referee Decision at 3.) The Referee further clarified that "[C]laimant was ultimately terminated for her actions which occurred while she was under investigatory suspension[,]" which include her contacting police departments and crime victims. (Id.) The Referee found that "[C]laimant's continued act of unprofessional behavior during her suspension is a disregard of the standards of behavior that . . . [E]mployer has the right to expect." (Id.) The Referee concluded that Employer had met its burden of showing that Claimant committed willful misconduct. Accordingly, the Referee affirmed the UC Service Center's determination and concluded that Claimant was ineligible for benefits under Section 402(e) of the Law.

Claimant appealed the Referee's Decision to the Board, which adopted and incorporated the Referee's findings of fact and conclusions of law and affirmed the Referee's Decision finding Claimant ineligible for UC benefits under Section 402(e) of the Law. (Board Order, Intervenor's Br., App. A.) The Board also denied Claimant's request for a remand hearing. (Id.) Claimant now petitions this Court for review of the Board's Order.[10]

On appeal, Claimant argues that the Board erred in finding her ineligible for benefits based on: (1) her use of an expletive over the phone to a crime victim; (2) her work history from 2008-2015; (3) her actions in response to her interest in her nephew's criminal case; and (4) her action in calling various police departments and crime victims to conduct a survey of her work performance. Claimant contends, generally, that no rules or policies were established regarding her conduct and that her conduct did not rise to the level of willful misconduct. Even if she did commit willful misconduct, Claimant argues that she had good cause for her actions. Claimant also asserts that she did not get the opportunity to present all

---

[10] This Court's scope of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact were supported by substantial evidence. Johns v. Unemployment Comp. Bd. of Review, 87 A.3d 1006, 1009 n.2 (Pa. Cmwlth. 2014). The Board is the factfinder in UC cases and is, thus, empowered to make credibility determinations and resolve conflicts in the evidence presented. Curran v. Unemployment Comp. Bd. of Review, 752 A.2d 938, 940 (Pa. Cmwlth. 2000). The Board's findings are conclusive on appeal if the record, as a whole, is supported by substantial evidence. Mathis v. Unemployment Comp. Bd. of Review, 64 A.3d 293, 299 (Pa. Cmwlth. 2013). We view the record in the light most favorable to the party that prevailed before the Board, and we afford that party the benefit of all reasonable inferences that can be drawn from the evidence to determine if substantial evidence exists. Big Mountain Imaging v. Unemployment Comp. Bd. of Review, 48 A.3d 492, 494-95 (Pa. Cmwlth. 2012). "Substantial evidence is such relevant evidence which a reasonable mind might accept as adequate to support a conclusion." Am. Gen. Life and Accident Ins. Co. v. Unemployment Comp. Bd. of Review, 648 A.2d 1245, 1248 (Pa. Cmwlth. 1994).

11

of her testimony and evidence at the Referee hearing. In response, Employer, intervenor in this matter, argues that substantial evidence supports the Board's findings of fact, and the Board and Referee properly concluded that Claimant committed willful misconduct and that she did not have good cause for her actions.

Section 402(e) of the UC Law provides, in pertinent part, that "[a]n employe shall be ineligible for compensation for any week . . . [i]n which h[er] unemployment is due to h[er] discharge or temporary suspension from work for willful misconduct connected with h[er] work." 43 P.S. § 802(e). While the Law does not define "willful misconduct," our Court has defined it as:

> (1) a wanton or willful disregard for an employer's interests; (2) a deliberate violation of an employer's rules; (3) a disregard for standards of behavior which an employer can rightfully expect of an employee; or (4) negligence indicating an intentional disregard of the employer's interest or an employee's duties or obligations.

Phila. Parking Auth. v. Unemployment Comp. Bd. of Review, 1 A.3d 965, 968 (Pa. Cmwlth. 2010). The employer bears the burden of proving a claimant's willful misconduct. Spirnak v. Unemployment Comp. Bd. of Review, 557 A.2d 451, 453 (Pa. Cmwlth. 1989). Where an employer alleges willful misconduct based on a claimant's violation of a work rule or policy, the employer must prove the existence of the rule, the reasonableness of the rule, and that the claimant violated the rule. Ellis v. Unemployment Comp. Bd. of Review, 59 A.3d 1159, 1162 (Pa. Cmwlth. 2013). If an employer makes a showing of willful misconduct, the burden shifts to the employee to establish good cause for his or her actions. Phila. Parking Auth., 1 A.3d at 968. Whether a claimant has good cause for his or her conduct is a question of law subject to our review and must be viewed in light of all of the attendant circumstances, "including the reasons for his or her

noncompliance with the employer's directives." Id.; see also Docherty v. Unemployment Comp. Bd. of Review, 898 A.2d 1205, 1208-09 (Pa. Cmwlth. 2006). A claimant has good cause if his or her actions are justifiable or reasonable under the circumstances. Docherty, 898 A.2d at 1208-09.

We begin by addressing Claimant's assertion that she did not get the opportunity to present all of her testimony and evidence at the Referee hearing. Specifically, Claimant argues that the Referee erred by not allowing Claimant to testify regarding her work history, her two sons' and nephew's autism, her flexible work schedule, her harassment allegations, and her interest in her nephew's criminal case.[11] In this regard, Claimant asserts that Employer used those things "to discipline her, to cause distress, hardship and harassment, and to hasten her termination[,]" and by not allowing testimony about those things, Claimant was prejudiced as a result. (Claimant's Br. at 31.) She also alleges that much of Employer's witnesses' testimony was hearsay, and thus, prejudicial to her case.

Although we appreciate that the UC appeals process can be challenging, we note that Claimant was represented by counsel at the Referee hearing. Further, our review of the record and hearing transcript reveals that the Referee informed the parties that each witness, including Claimant, would be permitted to give testimony and would all be subject to cross-examination. (R.R. at 7a-8a.) In addition, Claimant's counsel was afforded the opportunity to object to all of the exhibits entered into evidence at the hearing, though he did not object when first presented with that opportunity. (Id. at 7a.) Nevertheless, throughout the hearing, Claimant's counsel made numerous objections to certain testimony and documents

---

[11] Claimant has also attached a number of documents to her brief, including a harassment complaint that she had filed, which were not introduced into evidence at the Referee hearing.

13

based on hearsay, and the Referee sustained some, but not all of the objections. For example, the Referee overruled Claimant's counsel's relevancy objections to the entry of two documents into evidence, which include: the December 28, 2012 letter from the former District Attorney, which notified Claimant that her behavior regarding her "Attack on J[ . . . ]" file was unacceptable and directed her to "return [her] behavior to the previous high levels I have expected from you . . . ," and the July 21, 2014 formal reprimand from the former District Attorney advising Claimant that her unprofessional behaviors needed to stop immediately. (R.R. at 16a, 21a, 97a, 119a-20a.) Additionally, the Referee sustained an objection made by Claimant's counsel regarding testimony about a Greenville Police Department employee's statements regarding Claimant's call to the department. (Id. at 42a-43a.) The Referee also sustained Employer's counsel's relevancy objection to Claimant's testimony about her work history, permitting the parties to go back only to 2012, and her sons' autism. (Id. at 60a-61a.) Further, the Referee concluded that Claimant's flexible work schedule had no bearing on her decision in the case. (Id. at 61a.) As for Claimant's hearsay allegations, the Referee stated that she "do[es] understand in my position . . . I cannot base my Decision of eligibility on any hearsay whether it's been admitted to the record or not[,]" and that she would not consider "the portions of any of the letters that contain hearsay . . . in making my Decision." (Id. at 43a, 79a.) Thus, we conclude that Claimant did have ample opportunity to present her testimony and additional evidence and to object to other testimony and evidence at the hearing.

Turning to the merits, Claimant argues that the Board erred in finding her ineligible for benefits based on her use of an expletive over the phone to a crime victim, her work history from 2008-2015, her actions in response to her interest in

her nephew's criminal case, and her actions in calling various police departments and crime victims to conduct a survey of her work performance.

We will first address Claimant's argument that the Board erred in finding her ineligible for benefits based on her work history from 2008-2015 because she was denied the opportunity to question her immediate boss at the time, the former District Attorney, who did not testify at the Referee hearing. Initially, we note that the Notice of Hearing informed Claimant that she could call witnesses about matters that would be testified to at the hearing. (Notice of Hearing, R. Item 8 at 2.) She did not call the former District Attorney as a witness on her behalf, and Employer did not find it necessary to procure his testimony either. In addition, the Referee overruled objections to the entry of documents into evidence that were written by the former District Attorney on the basis that they were "official business" and also found in Claimant's personnel file. (R.R. at 16a-17a, 21a.)

Moreover, Claimant was terminated for several incidents that occurred *after* the former District Attorney left office in January 2016, including Claimant's comment, made during the January 29, 2016 disciplinary meeting, that her work requires her to interact with the "dregs of society," the fact that she denied ever making that comment during the February 5, 2016 meeting, her actions in looking in her co-workers' desks to locate her nephew's case file, and finally, her actions in calling various police departments and crime victims when she did not have permission to do so while on paid administrative leave. (FOF ¶¶ 4-7, 13-15, 17, 19-22, 24; Referee Decision at 3; Termination Letter, R.R. at 92a-94a.) The four witnesses that did testify on behalf of Employer had direct knowledge of the above conduct by Claimant that ultimately led to her termination. We therefore are not persuaded by this argument and conclude that the Board did not err in this regard.

15

As for the other incidents on which the Board relied, Claimant contends that she did not violate any of Employer's rules, and thus did not commit willful misconduct, because Employer did not establish any rules regarding her actions. She also asserts that, if there were rules in this regard, they were not effectively communicated to her, and she was not warned of the consequences of violating such rules. However, Claimant did not testify at the hearing that Employer did not have any rules regarding employee conduct when dealing with constituents. Though Claimant testified that she was not told what she could or could not do while on administrative leave, (R.R. at 62a), Claimant also did not testify that she was permitted by District Attorney to make the phone calls to conduct the survey or that she was not aware of Employer's insubordination policy. (See Termination Letter, R.R. at 94a ("I never requested that you conduct any such 'survey' and you were suspended from performing all job duties at the time you purported to be taking such 'survey.'").) In her brief, Claimant acknowledges the existence of the Mercer County Employee Handbook. Claimant also admitted that she had been warned in the past about her behavior, including by the former District Attorney, and that she had been directed to discontinue her unacceptable behavior and "confrontational and unprofessional insubordinate actions." (FOF ¶¶ 1-3; Record of Oral Interview, R. Item 4; R.R. at 73a-74a, 119a-20a.)

Employer, on the other hand, presented evidence at the hearing, through the testimony of Human Resources Director, that established its Employee Conduct and Discipline Policy, which lists certain unacceptable behavior including "[f]ailure to follow a supervisor's specific instructions or to perform assigned official duties" and using "[o]bscene or abusive language." (R.R. at 21a-22a, 121a-25a.) In addition, the policy prohibits "[i]nsubordination," "[i]mmoral,

16

indecent, abusive or menacing conduct," and "[j]ob incompetence, including non-adherence to established policies and procedures[.]" (Id. at 123a-24a.) Employer proved that Claimant was aware of these policies because she signed the Employee Handbook Acknowledgement on April 17, 2013. (Id. at 126a.) Employer also established that Claimant violated Employer's insubordination policy by refusing to follow District Attorney's reasonable directives to act and communicate professionally with her co-workers and others and to stop her unacceptable behavior, and the Referee and the Board, after review, determined that Claimant did continue to engage in unacceptable and unprofessional conduct. (FOF ¶¶ 4-5, 9-11, 12-14, 16, 18-22; R.R. at 119a-20a.) "[A] conclusion that the employee has engaged in disqualifying willful misconduct is especially warranted in . . . cases where . . . the employee has been warned and/or reprimanded for prior similar conduct." Oyetayo v. Unemployment Comp. Bd. of Review, 110 A.3d 1117, 1125 (Pa. Cmwlth. 2015) (quoting Ellis, 59 A.3d at 1163). Thus, there is substantial evidence of record showing that Employer met its burden of proving willful misconduct.

As for Claimant's contention that the Board erred in finding Employer's witnesses credible, (Claimant's Br. at 14-16), and that its findings are not supported by substantial evidence, (id. at 19), we note that it is well-settled that the Board is the ultimate factfinder in UC cases and is, thus, empowered to make credibility determinations and resolve conflicts in the evidence presented. Curran v. Unemployment Comp. Bd. of Review, 752 A.2d 938, 940 (Pa. Cmwlth. 2000). The Board here found Employer's testimony and evidence regarding Claimant's continued unacceptable, unprofessional, and insubordinate behavior to be more credible than the testimony and evidence offered by Claimant, which it was

17

empowered to do. As such, the Board did not err in concluding that Employer met its burden of proving willful misconduct, and the burden shifted to Claimant to establish good cause for her actions. Phila. Parking Auth., 1 A.3d at 968.

Claimant next argues that even if she did violate Employer's rules, she had good cause for her actions because: (1) she did not utter the expletive on the phone intentionally; (2) her actions with respect to her nephew's criminal case "were not divisive to the office nor were the actions done to circumvent justice on behalf of a relative"; and (3) she knew Employer would not honor a meaningful response from her to the February 18, 2016 letter, so she thought it would be best to ask the people that knew her best about her work performance to try and save her job. (R.R. at 64a; Claimant's Br. at 31.) Claimant also argues for the first time on appeal that she was disciplined because she made a sexual harassment complaint to the County Commissioners, and that she endured a hostile work environment. (Claimant's Br. at 11-12, 30; R.R. at 70a.)

We are to review the record in the light most favorable to Employer, as the party that prevailed before the Board, and we are to afford that party the benefit of all reasonable inferences that can be drawn from the evidence to determine if substantial evidence exists. Big Mountain Imaging v. Unemployment Comp. Bd. of Review, 48 A.3d 492, 494-95 (Pa. Cmwlth. 2012). Our review of the record in this case, when viewed in the light most favorable to Employer, demonstrates that there is substantial evidence to support the Board's determination that Claimant did not have good cause for repeatedly refusing to comply with Employer's reasonable directives to Claimant to stop her unprofessional behaviors and to act appropriately and professionally at work to her co-workers and others. There is also no evidence that Employer would not have accepted a written response from Claimant in

18

response to the February 18, 2016 letter, which permitted Claimant to submit to Employer a response regarding the incident involving her nephew's case file. Neither the February 18, 2016 letter, nor District Attorney, himself, permitted Claimant to call various crime victims and police departments about her work performance, and Claimant has not provided any good cause for doing so. There is evidence, however, that Claimant's actions in making those calls, in addition to her other conduct, was "unprofessional, hostile, and inappropriate." (Termination Letter, Mar. 1, 2016, R.R. at 92a-94a.) As for Claimant's sexual harassment and hostile work environment claims, Claimant had the opportunity to raise and develop these arguments before the Referee, but failed to do so. We therefore cannot consider them on appeal. As such, we agree with the Board that Claimant's allegations against Employer do not constitute good cause for her refusal to follow Employer's prior reasonable directives to change her behavior. Therefore, the Board did not err in finding Claimant ineligible for benefits pursuant to Section 402(e) of the Law.

Accordingly, the Board's Order is affirmed.

_____
**RENÉE COHN JUBELIRER,** Judge

19

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lisa George,                                    :
                              Petitioner          :
                                                :
              v.                                :       No. 1247 C.D. 2016
                                                :
Unemployment Compensation Board          :
of Review,                                      :
                              Respondent          :

# **O R D E R**

**NOW**, April 19, 2017, the Order of the Unemployment Compensation Board of Review, entered in the above-captioned matter, is hereby **AFFIRMED**.

_____
**RENÉE COHN JUBELIRER,** Judge